FILED
10/01/2025
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 3, 2025

## CHARLES W. SHOFFNER v. EPHRAIM MUVIRE UREVBU

**Appeal from the Chancery Court for Shelby County**
**No. CH-21-0496      JoeDae L. Jenkins, Chancellor**

_____

## No. W2024-00464-COA-R3-CV

_____

A property developer purchased a portion of a two-story building without having fully examined the property prior to acquiring it. The only existing means of accessing the second floor of his property was via a staircase owned by his neighbor. The developer did not have an express easement to use the staircase, and disagreements arose between the developer and his neighbor over the developer's use of his neighbor's staircase. In response, the developer filed suit. The developer claimed an easement implied by prior use, an easement by necessity, and/or a prescriptive easement. At trial, the neighbor sought, in effect, an involuntary dismissal at the close of the developer's proof. The trial court granted that motion, reasoning that the developer failed to meet his burden of proof with respect to all three of his easement theories. The developer appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jeffrey A. Land, Memphis, Tennessee, for the appellant, Charles W. Shoffner.

Robert L.J. Spence, Jr., Memphis, Tennessee, for the appellee, Ephraim M. Urevbu.

### OPINION

### I.

This case presents intriguing legal questions in relation to an easement for a staircase but ultimately turns upon evidentiary deficiencies in Appellant Charles Shoffner's proof. The trial court oversaw a bench trial with two distinct portions. One part focused on whether Mr. Shoffner had an easement for use of the staircase belonging to his neighbor,

Appellee Ephraim Urevbu. The second part focused upon Mr. Shoffner's petition for contempt against Mr. Urevbu. The trial court found against Mr. Shoffner both on his easement claim and his contempt petition. Mr. Shoffner appeals the former decision, challenging the trial court's ruling that he does not have an easement, but he does not appeal the trial court's denial of his contempt petition.

In this litigation, the parties duel over a staircase. The staircase is located within a two-story mixed-use building at the corner of South Main Street and Huling Avenue in Memphis, Tennessee. The mixed-use building contains commercial and residential space. "[T]he front of the building faces the river" while the back of the building is next to a service alley. The residential portion of the building has three residential addresses: 410 South Main Street, 412 South Main Street, and 414 South Main Street.[1] Mr. Urevbu owns the 410 and 412 South Main Street residential portion of the building, which is used as a family residence, while Mr. Shoffner owns 414 South Main Street. The commercial space in the portion of the building owned by Mr. Urevbu contains an art gallery. The staircase is entirely within the portion of the building owned by Mr. Urevbu. In relation to the portions of the building owned by Mr. Urevbu, the staircase provides a means of ingress and egress from the family residence and art gallery.

Mr. Shoffner's 414 South Main Street property includes an underground basement space, a first-floor commercial space, and a second-floor residential space that the parties call a condominium. The parties agree that the staircase at issue provides the only existing avenue of ingress and egress to the condominium. The staircase is not the means for accessing the other portions of Mr. Shoffner's property.

At trial, Mr. Shoffner introduced into evidence the map set forth below, which depicts the location of the building as well as the layout of the staircase and second floor:

---

[1] 414 South Main Street was also briefly referred to at trial by a Huling Avenue address based on a utility bill admitted into evidence.



**2nd Floor Condo** P2 SECOND FLOOR PLAN

Existing Staircase

FILED

OCT 10 2024

Clerk of the Appellate Courts
Rec'd By

EXHIBIT
10

To access the condominium from the street, an individual must walk through the door that faces Huling Avenue (located on the top right of the building in exhibit 10), ascend the staircase, and walk down a hallway that leads to a door to the condominium.

Problematically for Mr. Shoffner, he does not own the staircase or have an express easement right to make use of the staircase. This precarious access situation contributed to tension that eventually gave rise to this litigation.

In terms of the prior history of the property, Mr. Urevbu obtained full ownership of the building, which dates to the early 1900s, in 1999. Almost immediately thereafter, he sold 414 South Main Street to two individuals, Jerry L. Ivery and Faatimah Muhammad, "as joint tenants with full right[s] of survivorship and not as tenants in common." This conveyance did not include any ownership right to the staircase or an express easement permitting use of the staircase.

The record is silent on how, if at all, Mr. Ivery used 414 South Main Street. It is not clear whether he lived in that space or purchased the property to hold as an investment or

- 3 -

for some other purpose. It is not clear whether he ever even visited the property. Mr. Ivery did not testify at trial, and no other evidence was presented as to his usage of the property.

While not as silent as with regard to Mr. Ivery, the record is thin regarding Ms. Muhammad's use of 414 South Main Street. Ms. Muhammad also did not testify, and the record provides little information regarding the approximately twenty-year period between the date that she purchased 414 South Main Street and the date that Mr. Shoffner obtained ownership thereof. For example, the record contains virtually no details about Ms. Muhammad's use of 414 South Main Street between 1999 and 2016. An exception is the following paragraph of a pleading in a prior declaratory judgment action that Mr. Urevbu filed against Ms. Muhammad in 2017 that was attached as an exhibit to Mr. Shoffner's complaint and amended complaint in the present case:[2]

> Since the sale of [Mr. Urevbu's] property to [Ms. Muhammad], [Mr. Urevbu] has provided [Ms. Muhammad] permission to use [the] hallway to access her property from the north side of her property on Huling Street, while [Ms. Muhammad] constructs a staircase to provide her access to her property from the east border of [Ms. Muhammad's] property.

Though this pleading refers to forthcoming construction of an alternative staircase by Ms. Muhammad, both parties in the present case agree that no efforts were ever actually undertaken to construct such an alternative means of access.

Concerning Ms. Muhammad's use of the staircase in 2017, Mr. Urevbu's pleading further states:

> 9. Over the past two to three months, prior to the filing of this petition, [Ms. Muhammad] has taken affirmative steps to deny Plaintiff Urevbu access to the hallway wholly located on his property.
>
> 10. These actions include and are not limited to placing large items in front of Plaintiff Urevbu['s] door located on the east side of his building to serve as a barricade blocking his access to his hallway from his upstairs apartment.
>
> 11. [Ms. Muhammad] has also erected an iron door on Plaintiff's northern border of his property blocking Plaintiff's access to his hallway via Huling Street.
>
> . . . .

---

[2] This pleading does not name Mr. Ivery as a party to the lawsuit.

14. Although [Mr. Urevbu] has requested through his attorneys and agents that [Ms. Muhammad] refrain from blocking his access to his hallway and encroaching on [Mr. Urevbu's] property, [Ms. Muhammad] has refused to do so and continues to encroach upon [Mr. Urevbu's] property and deny [Mr. Urevbu] access to his hallway located on his property.

15. [Ms. Muhammad] is attempting to extend [her] property lines further onto the property . . . unlawfully and illegally by placing items on [Mr. Urevbu's] property to block [Mr. Urevbu's] access to his doorway and subsequently erecting an iron door on [Mr. Urevbu's] property further blocking access to his hallway. These actions provide [Ms. Muhammad] exclusive use of the hallway located on [Mr. Urevbu's] property.

While Mr. Shoffner attached a copy of this pleading to his complaint and first amended complaint, he did not submit the pleading as evidence at trial. He did not question any witnesses in connection with the pleading. During the course of the bench trial, he did not ask the court to take judicial notice of this pleading, nor did the trial court take judicial notice of this pleading. Additionally, the above noted assertions are pleadings from litigation between Mr. Urevbu and Ms. Muhammad in a dispute over Ms. Muhammad blocking the hallway. In the course of the bench trial proceedings to determine whether Mr. Shoffner has an easement to the staircase, it appears that this pleading was mentioned during Mr. Shoffner's opening statement and then not further addressed in presenting evidence to the trial court.

The record also contains an order from a chancery court in the Urevbu-Muhammad litigation. In that proceeding, Mr. Urevbu evidently alleged that Ms. Muhammad had been interfering with his use of the hallway. He sought an injunction to address this interference. In its order, the Chancery Court noted that Mr. Urevbu and Ms. Muhammad "dispute ownership of the hallway" and "enjoined [them] from restricting access to the hallway." The court also required Mr. Urevbu to "provide [Ms. Muhammad] prior notice of his intent to use the hallway in question." As with the above-described pleading from the Urevbu-Muhammad litigation, this order is attached to Mr. Shoffner's complaint and first amended complaint. Again, in addressing whether he had an easement, Mr. Shoffner never introduced this order into evidence at the bench trial. He never questioned any witness in connection with this order. He also never asked the trial court to take judicial notice of the order nor did the trial court take judicial notice of the order in the bench trial proceedings. Aside from the pleading and order described above, the record does not contain any additional documents from the Urevbu-Muhammad litigation.

In 2019, Ms. Muhammad's lender, Regions Bank, foreclosed. During a foreclosure sale that occurred on November 8, 2019, the property was "sold to [Mr.] Shoffner, at the sum of $510,000.00 . . ., that being the highest bid offered." Mr. Shoffner obtained a Successor Trustee's deed to the property. That deed does not reference the staircase and

does not grant Mr. Shoffner an easement to make use of the staircase.

Mr. Shoffner, who owns and manages numerous properties in Memphis, purchased 414 South Main Street for the purpose of leasing it. He realized his goal for the first-floor commercial space, executing a five-year lease in 2021 with a company called Level Up Entertainment "for the purpose of [operating] a Retail Bar, Restaurant, and Entertainment center." The lease provides that Level Up would pay Mr. Shoffner $6,800 per month through October 2024 and then $7,200 per month through the lease's October 2026 expiration date. Things did not go as planned, however, for the condominium. Mr. Shoffner testified that he discovered Ms. Muhammad acting as a "squatter" in the space after his purchase, refusing to vacate even after the foreclosure sale. He noted that, on one occasion, she greeted him at the door holding a shotgun. Mr. Shoffner testified that he spent approximately two years fighting to evict Ms. Muhammad and only obtained full possession of the condominium in April 2021.

Additionally, Mr. Urevbu texted Mr. Shoffner expressing his intent to brick off "the entire wall that currently allows entry to the condo." Mr. Shoffner responded, explaining that bricking off the entire wall would totally prevent him from being able to access the condominium and insisting that he could not "build [another] staircase without destroying access to [his] property." He followed up by saying that "[f]or me to build stairs from the Restaurant would kill the space."

Mr. Shoffner filed this lawsuit seeking a declaratory judgment and injunctive relief. Regarding the existence of an easement for use of the staircase, Mr. Shoffner asserted in his complaint that he "has an easement to access his apartment. Said easement has been in existence for more than one hundred years since the construction of the Building," but did not identify the exact nature of his purported easement. Mr. Urevbu categorically denied the existence of any type of easement. Mr. Shoffner also urged the trial court to extend an injunction from the Urevbu-Muhammad litigation to this lawsuit until a decision could be made about the existence of an easement at the final hearing. The parties agreed upon a temporary injunction.

Prior to trial, Mr. Shoffner filed a memorandum identifying his easement theories. Specifically, he asserted that he was the beneficiary of "a prescriptive easement, an implied easement and an easement by necessity in and to the stairwell." He also requested that the trial court physically inspect the premises prior to trial, and the trial court granted the request.

Significantly, Mr. Shoffner proposed the admission of an expert witness to testify about the cost and feasibility of constructing a new staircase. Mr. Urevbu brought to the court's attention that Mr. Shoffner's proposed expert was not licensed and had previously been disciplined by the State of Tennessee. Mr. Shoffner told the trial court that he was unaware of this information, withdrew his proposed expert, and asked for an enlargement

of time to propose a second expert, which the trial court granted. For reasons that are not fully explained in the record, Mr. Shoffner never completed the process of moving forward with a second expert.

The trial court oversaw a bench trial on January 30, 2024. In his opening statement, counsel for Mr. Shoffner indicated that counsel "would qualify [Mr. Shoffner] as an expert in construction, construction technique and construction costs that he did for 40 years now and [is] still doing." Mr. Shoffner's counsel also noted that Mr. Shoffner would provide expert testimony establishing the year when the doorway was put into the building to access the condominium. Counsel also indicated in his opening that Mr. Shoffner would offer expert testimony as to the impracticability of adding a stairway on the first floor of his property to access the second-floor condominium in connection with construction costs and the loss of rental value that would result from reduced capacity.

Mr. Urvebu objected to Mr. Shoffner offering expert testimony in the case based upon failure to comply with the scheduling order related to disclosure of expert testimony. After arguments in relation to this matter, Mr. Shoffner's counsel indicated that he would not need to offer expert testimony from Mr. Shoffner, that he would instead present lay testimony from Mr. Shoffner, and that Mr. Urvebu's objection should be deemed moot by the trial court. The trial court declined to conclude the objection was moot and instead sustained Mr. Urvebu's objection. A lurking question underlying the evidence in the bench trial was identifying the line between testimony that Mr. Shoffner's counsel sought to admit as lay testimony from Mr. Shoffner and testimony constituting expert testimony from Mr. Shoffner, which had been excluded by the trial court.

At trial, Mr. Shoffner testified that 414 South Main Street was one of approximately 20-25 properties that he manages in downtown Memphis. He recounted the experience of purchasing the property, emphasizing that he was able to use the staircase and go all the way down the hallway during his due diligence period but that he could not access the interior of the condominium because "[i]t was locked." Mr. Shoffner described the layout of his property and the rest of the building, explaining that the entire building "has three doors, three entrances" but that only "[o]ne of them leads up to my condo."

Regarding the possibility of building an alternative staircase, Mr. Shoffner noted that Mr. Urevbu had advocated connecting the first-floor commercial space directly to the second-floor condominium. When Mr. Shoffner attempted to share his opinions concerning construction of and expenses and costs in connection with a new staircase being constructed on his first floor property to the condominium, Mr. Urevbu renewed his objection to Mr. Shoffner submitting what he characterized as expert testimony. While Mr. Shoffner countered that he believed this information constituted admissible lay testimony, the trial court disagreed and instead instructed Mr. Shoffner to make an offer of proof.

The following testimony was elicited during Mr. Shoffner's offer of proof:

[Counsel]: Mr. Shoffner, if the proposed stairway was installed into your restaurant located at 414 South Main Street, would that have an adverse impact to the rentability of that space?

[Mr. Shoffner]: Yes. It would definitely have an impact on the renting of that space.

[Counsel]: Describe that.

[Mr. Shoffner]: It would knock out one-third of the seating of the whole restaurant.

[Counsel]: How would that impact the rentability?

[Mr. Shoffner]: It would drop the rentability down by more than $1,500 a month. It's a smaller operation, it's – the front of the restaurant is the main area with all the seating. The kitchen, even though it's not affected, the area where you have your (inaudible) is what's more important.

[Counsel]: What would be the cost of the installation of the stairway?

[Mr. Shoffner]: The stairway comes to about $50,000 to build. And I would lose the front of the store. The front of the store (inaudible) $35,000 for the front.

[Counsel]: So the total is $85,000?

[Mr. Shoffner]: $85,000.

[Counsel]: Would the installation of that stairwell adversely impact the rentability of the condominium?

[Mr. Shoffner]: Yes, I think quite a bit. It would knock out all the restrooms, so (inaudible) affect the rentability (inaudible).

[Counsel]: Would it reduce the fair market (inaudible)?

[Mr. Shoffner]: It would take the (inaudible) about (inaudible) in value. It – (inaudible) 800 to $900 a month.

[Counsel]: That's all I have on that, Your Honor.

With the offer of proof completed, the trial resumed.

During cross-examination, Mr. Shoffner acknowledged that the legal description of his property featured in the Successor Trustee's deed does not mention the staircase and does not grant him an easement. He said that he believed the staircase was "mutual property" and asserted that he had no reason to anticipate having to build an additional staircase when he bought the property. Mr. Urevbu's counsel pushed on the shared nature of the staircase, which led to the following exchange:

[Counsel]: Now, you did not have exclusive and sole possession of that stairway, did you?

[Mr. Shoffner]: No

. . . .

[Counsel]: But at no point in time did you have the use of this stairway exclusively, did you?

[Mr. Shoffner]: No.

[Counsel]: In fact, the defendant had the right to perform his own work in this stairway, did he not?

[Mr. Shoffner]: He sure does.

While Mr. Shoffner's supporting witnesses mainly testified about the pending contempt petition, they also acknowledged that the hallway was effectively shared during the pendency of the case.

As noted above, Mr. Shoffner did not call Mr. Ivery or Ms. Muhammad to testify, and he similarly did not call Mr. Urevbu as a witness during his case in chief. Mr. Shoffner did not call any other witnesses who had knowledge of Mr. Ivery and Ms. Muhammad's use of the property. Mr. Urevbu only testified during the second part of the trial, which concerned the contempt charges that Mr. Shoffner filed against him. Mr. Shoffner also did not enter into evidence any of the documents that he attached to his original complaint as substantive proof or exhibits at trial. In the part of the trial addressing whether Mr. Shoffner has an easement, Mr. Shoffner did not ask questions of any witness regarding the previous litigation. He also did not ask the trial court to take judicial notice of the documents from the prior Urevbu-Muhammad litigation, nor did the trial court indicate that it was taking such notice.

The prior litigation was mentioned during Mr. Shoffner's opening statement in the form of abbreviated, passing references:

The history of acquisition of the building, in 1998, Mr. Urevbu purchased the building in it['s] entirety and apparently fixed up the one-third portion, and in 1999, sold it off to Faatimah Muhammad. There is still pending litigation in this court between Faatimah Muhammad and Mr. Urevbu regarding who gets – who gets to use the stairwell. The Court – I believe, 2017, a copy of the order is attached to the complaint.

The Court ordered that neither of those two parties interfere with the other's use of that stairwell . . . .

. . . .

In 1999, he sold one-third of the building to Ms. Muhammad. And again, that litigation is here, and Your Honor said in his order, "Neither of you can interfere with either's use of the stairwell," which we're here now. So I'll have more to say about how effective that is with this particular defendant. And also, "Neither will interfere with either's use of the service alley." And the proof will show that – well, let me finish with the chain of title.

At the close of Mr. Shoffner's proof, Mr. Urevbu orally sought what he termed a "motion for a directed verdict." Addressing Mr. Shoffner's references to prior litigation in his opening statement, Mr. Urevbu's counsel stressed that Mr. Shoffner did not actually submit the documents from that litigation into evidence as substantive trial proof:

Your Honor, one of the (inaudible) of (inaudible) is that when the Court (inaudible) and the trial begins, it's what occurs in here that is the record. That is the record. And so we have to look at the record in these proceedings and whether or not the plaintiff has met [his] burden based on this record, not (inaudible) [Mr. Shoffner's counsel] argued. And he's talking about the Faatimah Muhammad case. There's nothing on (inaudible) about Ms. Muhammad. The court doesn't have to go scrambling through the pleadings filed in the clerk's office for some document that helps the plaintiff prove an element in this case. So whatever happened in the Faatimah Muhammad case is not before this Court. It's not a part of this trial. It doesn't matter that [counsel] might've attached one of the pleadings from that case to his complaint. He didn't put it on in this trial. He didn't introduce it as a piece of evidence for the court to consider.

So the Court doesn't have to scurry over to the clerk's office and find a pleading from unrelated cases that [counsel for Mr. Shoffner], preferring a

directed verdict (inaudible) he put on when he didn't. An[y] orders from Faatimah Muhammad case, it don't have nothing to do with this trial. One, there would be interrogatories. But two, (inaudible). The record of the trial, not in some pleading that was filed during the (inaudible) of the trial that is not in this trial record.

So there is nothing about the Ms. Muhammad case that's before this Court.

The trial court granted Mr. Urevbu's motion. In its written order, the trial court noted that Mr. Shoffner had pursued three types of easements: an easement by necessity, an easement implied by prior use, and a prescriptive easement. The trial court concluded that Mr. Shoffner failed to submit sufficient proof to establish that he had an easement. Addressing the easement by necessity theory, the trial court concluded that Mr. Shoffner had not demonstrated the existence of necessity because "a reasonable alternative" existed, namely, building another staircase. The trial court's reasoning with respect to Mr. Shoffner's implied use easement theory was quite similar. It found that Mr. Shoffner "can still enjoy 414 S. Main and the second-floor apartment, without an easement; however, his enjoyment will come with a cost; the cost necessary to construct stairs." Regarding Mr. Shoffner's prescriptive easement theory, the trial court reasoned that Mr. Shoffner had failed to demonstrate continuous and uninterrupted use of the stairway during the prescriptive period and had failed to demonstrate adversity.

Because Mr. Urevbu's directed verdict motion only applied to Mr. Shoffner's easement theories, the trial court heard further testimony on Mr. Shoffner's contempt petition. After hearing that testimony, the trial court also denied Mr. Shoffner's petition for contempt.

Mr. Shoffner appealed only the trial court's decisions concerning his purported easement to this court. Mr. Shoffner asserts that the trial court erred in its analysis on all three of his asserted easement theories, contending that he submitted sufficient evidence at trial.

In his briefing on appeal, Mr. Shoffner does not address the trial court's decision to sustain Mr. Urvebu's objection, which prevented Mr. Shoffner from testifying as an expert. He has left that evidentiary ruling unchallenged. Additionally, on appeal, Mr. Shoffner fails to address how the testimony elicited during his offer of proof would constitute lay, rather than expert, testimony. Mr. Shoffner has failed to challenge or articulate why the trial court's evidentiary ruling excluding his proffered evidence was in error. In other words, Mr. Shoffner has made no argument for why the proffered evidence should be considered.

II.

Although this case was tried without a jury, Mr. Urevbu sought and obtained a "directed verdict" at the end of Mr. Shoffner's case in chief. This labeling reflects conflation of a Rule 41.02 motion for involuntary dismissal with Rule 50 motion for directed verdict. *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 520 (Tenn. Ct. App. 2002). Rule 50 motions for directed verdict are for jury trials while Rule 41.02 involuntary dismissal motions are for bench trials. *Id.*

When faced with mislabeling of a Rule 41.02 voluntary dismissal motion as a Rule 50 directed verdict motion, this court has indicated that "we will construe the trial court's order as if it were an order granting a Tenn. R. Civ. P. 41.02 dismissal." *Boyer v. Heimermann*, 238 S.W.3d 249, 254 (Tenn. Ct. App. 2007) (collecting cases). As this court has previously explained,

> In the case of a motion for directed verdict, the trial court must take the strongest legitimate view of the evidence against the directed verdict and must deny the motion in any case where all reasonable persons would not reach the same conclusion. However, in the case of a motion for involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02(2), the trial court must impartially weigh and evaluate the evidence as it would after the presentation of all the evidence and must deny the motion if the plaintiff has made out a prima facie case.

*Smith v. Inman Realty Co.*, 846 S.W.2d 819, 821-22 (Tenn. Ct. App. 1992) (citations omitted); *see also City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 740 (Tenn. 1977) (explaining that "the trial judge must impartially weigh and evaluate the evidence in the same manner as though he were making findings of fact at the conclusion of all of the evidence for both parties, determine the facts of the case, apply the law to those facts, and, if the plaintiff's case has not been made out by a preponderance of the evidence, a judgment may be rendered against the plaintiff on the merits").

The distinction impacts an appellate court's standard of review. If this were a directed verdict appeal, this court would, like the trial court, be obligated to take the strongest legitimate view of the evidence in favor of the plaintiff, *see, e.g., Vitellaro v. Goodall*, No. M2023-00246-COA-R3-CV, 2024 WL 3520156, at *5 (Tenn. Ct. App. July 24, 2024), *perm. app. denied* (Tenn. Dec. 10, 2024), but "[t]he standard of review of a trial court's decision to grant a Rule 41.02 involuntary dismissal is governed by Rule 13(d) of the Tennessee Rules of Appellate Procedure." *Boyer*, 238 S.W.3d at 254. "Thus, we must review the record on appeal de novo with a presumption that the trial court's factual findings are correct" and "affirm the trial court's decision unless the evidence preponderates against the trial court's factual determinations or unless the trial court has committed an error of law affecting the outcome of the case." *Id.* at 254-55.

III.

As Mr. Shoffner acknowledged at trial, he does not own the staircase at issue; Mr. Urevbu does. Mr. Shoffner instead filed suit to secure recognition of an easement right to use the staircase to access the condominium for himself and his future tenants.

"An easement is an interest in property that confers on its holder a legally enforceable right to use another's property for a specific purpose." *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998) (citing *Pevear v. Hunt*, 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996)). The holder of an easement is said to own "the dominant estate" while the person whose property is subject to the easement is said to own "the servient estate." *Hixson v. American Towers, LLC*, 593 S.W.3d 699, 710 (Tenn. Ct. App. 2019) (quoting *Rogers v. Roach*, No. M2011-00794-COA-R3-CV, 2012 WL 2337616, at *8 (Tenn. Ct. App. Jun. 19, 2012)). An easement grants the dominant estate owner "rights" to make use of the servient estate but also imposes "restrictions" upon that use to ensure "due and reasonable enjoyment of both the easement and the servient estate." *Id.* (quoting *Rogers*, 2012 WL 2337616, at *8).

All easements fall within "two broad classes[:] easements appurtenant, and easements in gross." *Pevear*, 924 S.W.2d at 116. An easement in gross benefits only one person and is solely dependent on that person, whereas an easement appurtenant runs with the land, meaning it also benefits future users of the same servient estate. *See id.* ("Easements in gross are simply a personal interest or right to use the land of another which does not benefit another property, or dominant estate."); *Lynn v. Turpin*, 215 S.W.2d 794, 796 (Tenn. 1948) (indicating that an appurtenant easement "is not a mere privilege to be enjoyed by the person to whom it is granted or by whom it is reserved. It passes by a deed of such person to his grantee and follows the land without any mention whatever."). Easements in gross are disfavored under Tennessee law, "and an easement will never be presumed to be a mere personal right when it can fairly be construed to be appurtenant to some other estate." *Lynn*, 215 S.W.2d at 795-96 (quoting 28 C.J.S. Easements § 4); *see Lewallen v. York*, No. E2004-02042-COA-R3-CV, 2005 WL 1528271, at *3 (Tenn. Ct. App. June 29, 2005) ("It is well-settled in Tennessee that an easement will not be presumed to be in gross."). Mr. Shoffner did not pursue an easement in gross in the trial court, so we tailor our discussion to the question of whether he is entitled to an easement appurtenant that will also flow to his successors in interest.

In Tennessee, easements can be created by "(1) express grant, (2) reservation, (3) implication, (4) prescription, (5) estoppel, and (6) eminent domain." *Coolidge v. Keene*, 614 S.W.3d 106, 116 (Tenn. Ct. App. 2020). At trial, Mr. Shoffner claimed that he was entitled to an easement via implication and prescription. Mr. Shoffner needs only to prevail under one method to succeed in this appeal. Because the underlying principles of law that form the foundation of the implication and prescription creation methods differ significantly, we address each method in separate sections below, starting with implication.

- 13 -

IV.

Implied easements exist because of a presumption "that a grantor intends to include in a conveyance whatever is necessary for the beneficial use and enjoyment of the property conveyed," even if the grantor does not explicitly mention a basic or seemingly obvious facet of the property in the deed. *Cellco P'Ship v. Shelby Cnty.*, 172 S.W.3d 574, 589 (Tenn. Ct. App. 2005) (quoting *Adcock v. Adcock*, No. 01-A-01-9505-CH-00220, 1995 WL 675852, at *4 (Tenn. Ct. App. Nov.15, 1995)). One basic facet of land ownership that often takes center stage in implied easement cases is access, which is not always expressly accounted for in land deeds. *Ingram v. Wasson*, 379 S.W.3d 227, 239-40 (Tenn. Ct. App. 2011) (discussing basic presumptions, restatement provisions, and public policy rationales for implying easements for the purpose of granting "access rights"). By their nature, implied easements are unwritten.

In this case, Mr. Shoffner asserts two alternative theories regarding implied easements. He contends that he has an easement implied by prior use, and he also asserts that he has an easement by necessity. While these are two different types of implied easements, "there is considerable overlap between an easement implied by prior use and an easement created by necessity," which sometimes creates "confusion." *Ingram*, 379 S.W.3d at 240.

Easements implied by prior use give life to the "assumption that people intend to buy and sell land with the *existing* access arrangements" intact. *Id.* at 239 (citing Restatement (Third) of Property: Servitudes § 2.12, cmt. (a)) (emphasis added). Historically, this type of implied easement was described as one

> [w]here, during the unity of title, an apparently permanent and obvious servitude is imposed on one part of an estate in favor of another part, which servitude is in use at the time of severance and is necessary for the reasonable enjoyment of the other part, on a severance of the ownership a grant of the right to continue such use arises by implication of law. Similarly, where the owner of property, one part of which has been subjected to such a use for the benefit of another part, sells both parts to different purchasers, the respective portions granted are subject to or benefited by, as the case may be, an easement corresponding to such use. The principle under which the existence of an apparent use affords the creation of an implied easement has been applied to create an easement in a grantor by implied reservation.

*Lively v. Noe*, 460 S.W.2d 852, 854-55 (Tenn. 1970) (quoting 25 Am. Jur. 2d, Easements and Licenses § 27).

This description has since been fashioned into a multi-element test. Under this test,

the party claiming the existence of an easement implied by prior use must demonstrate:

> (1) A separation of the title; (2) Necessity that, before the separation takes place, the use which gives rise to the easement shall have been long established and obvious or manifest as to show that it was meant to be permanent; and (3) Necessity that the easement be essential to the beneficial enjoyment of the land granted or retained.

*Newman v. Woodard*, 288 S.W.3d 862, 866 (Tenn. Ct. App. 2008) (citing *Fowler v. Wilbanks*, 48 S.W.3d 738, 741 (Tenn. Ct. App. 2000)).

While Tennessee does not require a claimant to demonstrate "strict or absolute necessity" when pursuing an implied easement by prior use, *id.*, the plaintiff does have to demonstrate that the proposed easement is "reasonably necessary for the enjoyment of the dominant tenement." *Fowler*, 48 S.W.3d at 741 (first citing *Line v. Miller*, 309 S.W.2d 376, 377 (Tenn. Ct. App. 1957), then citing *Johnson v. Headrick*, 237 S.W.2d 567, 570 (Tenn. Ct. App. 1948)) (internal quotation marks omitted). The reasonable necessity component reflects the longstanding principle that an implied easement by prior use "should only arise where it is of such necessity that it must be presumed to have been within the contemplation of the parties." *Newman*, 288 S.W.3d at 866 (citing *Fowler*, 48 S.W.3d at 740); *Cellco P'Ship*, 172 S.W.3d at 589 (quoting *The Pointe, LLC v. Lake Mgmt. Ass'n, Inc.*, 50 S.W.3d 471, 478 (Tenn. Ct. App. 2000)). Additionally, "[a]nother essential [element] is sometimes added to these—namely, that the servitude be continuous, as distinguished from temporary or occasional." *Cellco P'Ship*, 172 S.W.3d at 589 (quoting *Johnson*, 237 S.W.2d at 570).

Many aspects of an easement by necessity "overlap" with the principles underpinning an easement implied by prior use. *Ingram*, 379 S.W.3d at 240. As this court explained in *Ingram v. Wasson*, 379 S.W.3d 227, 240 (Tenn. Ct. App. 2011),

> [b]oth [types] are implied, both arise from a conveyance, [and] both hinge on a finding of necessity. Hence, the confusion. To distinguish between them, an easement created by necessity "does not depend on a prior use" and the fact that any prior use "is permissive is irrelevant to the question [of] whether [an] easement [created by] necessity will be deemed to exist." 25 Am. Jur. 2d *Easements and Licenses* § 32. Moreover, an easement created by necessity "need not be in existence at the time of the conveyance" and may allow for a route of access where one previously did not exist. *Id.*; *see Cellco [P'Ship]*, 172 S.W.3d at 591.

*Ingram*, 379 S.W.3d at 240; *see also Newman*, 288 S.W.3d at 867 ("[A]n implied easement [from prior use] is distinct from an implied easement by necessity; an implied easement by necessity allows for the establishment of a right-of-way where one previously did not

- 15 -

exist.").

Consistent with this description, a plaintiff claiming the existence of an implied easement by necessity must show:

> 1) the titles to the two tracts in question must have been held by one person; 2) the unity of title must have been severed by a conveyance of one of the tracts; 3) the easement must be necessary in order for the owner of the dominant tenement to use his land[,] with the necessity existing both at the time of the severance of title and the time of exercise of the easement.

*Cellco P'Ship*, 172 S.W.3d at 592 (quoting *Powell v. Miller*, 785 S.W.2d 37, 39 (1990)). As is true in the context of implied easements by prior use, "Tennessee does not require [the existence of] 'strict necessity'" in the context of implied easements by necessity. *Newman*, 288 S.W.3d at 868 (quoting *Cellco P'Ship*, 172 S.W.3d at 592). However, "the degree of necessity must be more than 'mere convenience.'" *Id.* (quoting *Cellco P'Ship*, 172 S.W.3d at 592).

Mr. Shoffner contends that he submitted sufficient evidence to meet the requirements to establish a right to an easement under both a theory of an easement by necessity and a theory of an easement implied by prior use. The trial court concluded that he did not. The trial court ruled as follows:

> Plaintiff's proof with regard to an easement by necessity was deficient, because the Plaintiff failed to establish that the easement was necessary. The ability to construct stairs to the second-floor apartment militates against a finding of an easement by necessity. Plaintiff readily admits he can construct stairs, but does not want to do so because of the cost. Because the Plaintiff has a reasonable alternative to establish ingress and egress to the second-floor apartment, although less desirable and with a cost, an easement by necessity will not be imposed. In order to have an easement by necessity a party must establish that the beneficial use cannot be achieved without the necessary easement. Plaintiffs proof failed to establish this fact and demonstrated the opposite.
>
> . . .
>
> The Court finds Plaintiff's proof with regard to an easement by implication was deficient, because Plaintiff can still enjoy 414 S. Main and the second-floor apartment, without an easement; however, his enjoyment will come with a cost; the cost necessary to construct stairs.
>
> Because of these proof failures, at the conclusion of Plaintiff's proof,

- 16 -

the Court granted a directed verdict in favor of Defendant. The Court finds Plaintiff failed to demonstrate the elements necessary to prove the existence of any type of permanent easement for the back stairwell in his favor.

The Court further finds that Defendant shall retain sole ownership of the back stairwell and said ownership shall be unencumbered.

In its oral ruling, which accompanies the trial court's written order, the trial court, addressing the prior use of the property, observed the following: "[W]e have no proof on that. Again, I [go] back to the problem with the proof as to [Ms.] Muhammad and the lack thereof. So the problem continues into this element. There simply is no proof on that element."

We find no reversible error. Based upon the evidence admitted at trial, the trial court did not err in concluding that Mr. Shoffner's evidence fell short on the element of necessity. As previously noted above, both implied easements by prior use and implied easements by necessity "hinge on a finding of necessity." *Ingram*, 379 S.W.3d 240. While the necessity need not be strict or absolute, it must exceed mere convenience. *Newman*, 288 S.W.3d at 868 (quoting *Cellco P'Ship*, 172 S.W.3d at 592). When considering implied easement claims, this court has previously held that "[a] way of necessity will not be implied where claimant has another reasonable or practicable mode of ingress and egress." *Cellco P'Ship*, 172 S.W.3d at 592 (quoting 28A C.J.S. Easements § 97 (1996)). This rule also applies where a "substitute" or alternative method of access can be constructed by the easement claimant. *Line*, 309 S.W.2d at 377 ; *Barrett v. Hill*, No. 01A01-9806-CV-00295, 1999 WL 802642, at *4 (Tenn. Ct. App. Oct. 7, 1999) (citing *Line*, 349 S.W.2d at 377, for the proposition that necessity hinges on whether the party claiming the easement can create a substitute at a reasonable cost).

Here, the trial court emphasized Mr. Shoffner's burden of proof and his ability to remedy his access issue by constructing a second staircase. Specifically, the trial court found that constructing a second staircase was a "reasonable alternative" to granting Mr. Shoffner an implied easement and that Mr. Shoffner "can still enjoy 414 S. Main and the second-floor apartment" provided he pay "the cost necessary to construct stairs."

Mr. Shoffner does not contend that it is physically impossible to build a second staircase but rather that the cost of undertaking such a construction effort is unreasonable. He contends that the financial burden associated with constructing Mr. Urevbu's proposed alternative staircase is so unreasonable that he should be entitled to an implied easement notwithstanding the potential alternative access arrangement.

This court has previously stated that "[t]he test of necessity is whether the party claiming the right can, at *reasonable* cost, create a substitute on his own estate." *Line*, 309 S.W.2d at 377 (quoting 28 C.J.S. Easements § 33) (emphasis added). However, Tennessee

appellate courts have provided limited guidance on differentiating between reasonable and unreasonable costs when faced with evidence of a potential alternative method of obtaining access to real property.[3]  Most cases have addressed the cost issue on an ad hoc basis.  *See, e.g., id.* at 377 (concluding that "a cost of $300 or less" was reasonable for installing a new sewer line); *Newman*, 288 S.W.3d at 868 (finding no basis for concluding it would be impracticable to build a new road where a bulldozer operator testified that it would cost "six hundred to a thousand dollars"); *see also Fowler*, 48 S.W.3d at 741 (agreeing with the

---

[3] Other jurisdictions have adopted a variety of approaches to assessing whether the cost of constructing a proposed alternative method of access is unreasonable.  *Compare Bartkowski v. Ramondo*, 219 A.3d 1083, 1094, 1096 (Pa. 2019) (listing "the costs involved" as one "non-exclusive factor" to consider when assessing the reasonableness of a proposed alternative and explaining that "although the cost or difficulty of constructing alternative access may not always, or even often, be sufficient by itself to warrant burdening another's property, there may be a tipping point at which it becomes manifestly unreasonable to require a party to expend a *disproportionate* amount of money in order to access a parcel" (emphasis added)); *Beeson v. Phillips*, 702 P.2d 1244, 1247 (Wash. Ct. App. 1985) ("Washington appears to have announced a reasonable necessity rule that holds a taking will not be tolerated unless the necessity is paramount in the sense that there is no other way out or that the cost is *prohibitive*.  Phillips does not seriously challenge the court's determination that the cost of building a road, even given its feasibility, would be *prohibitive*." (emphasis added)); *Miller v. Schmitz*, 400 N.E.2d 488, 491 (Ill. App. Ct. 1980) (concluding in a jurisdiction where "it is sufficient if the claimed easement is highly convenient and beneficial" that the benefit of the easement outweighed the cost of building a bridge to cross a creek where the plaintiff made "$500 to $900 [in profit] over the past 15 years" and "it would cost plaintiff $24,790 to construct a low-water bridge across the creek and $1,000 annually to maintain it"), *with Ward v. Trimac Investments, LLC*, 78 So.3d 341, 345 (Miss. Ct. App. 2011) (holding that a "disproportionate expense and inconvenience" in the context of an easement by necessity only exists "if the expense of making the means of access available would *exceed the entire value of the property to which access was sought*." (quoting *Evanna Plantation, Inc. v. Thomas*, 999 So.2d 442, 446 (Miss Ct. App. 2009) (emphasis added))).

Secondary authorities have provided additional guidance, but it does not appear that this guidance has been universally accepted.  *See, e.g.,* Restatement (Third) of Property § 2.15 cmt. (d) (2000) (noting that cost may prove outcome-determinative if constructing an alternative would require "disproportionate effort or expense"); James Charles Smith & Donald J. Kochan, *Law of Neighbors* § 8:4 Easements by Necessity (2024) (explaining that, in reasonable necessity jurisdictions, a showing that "constructing useable access . . . is very expensive compared to a modest expense through the servient estate" may sometimes suffice).

Additionally, other jurisdictions have sometimes expanded the relevant inquiry regarding whether an easement claimant should be required to construct an alternative method of access beyond the question of cost.  For example, in Pennsylvania, courts also consider

> multiple [other] factors, including, but not limited to: the existence of zoning restrictions and the likelihood that the party can obtain the necessary variances or exceptions; the existence of state or federal regulations that prohibit certain uses of the land in question; the topography of the land and the practicability of constructing alternative access; the environmental consequences of construction; . . . and, of course, whether and to what extent these impediments existed at the time of severance.

*Bartkowski*, 219 A.3d at 1096.

trial court that "it would be expensive to construct and improve a road to the quality of the one which has been used for more than twenty years"). These cases depended upon the existence of a factual record concerning the cost of constructing a proposed alternative method of access. If an easement claimant does not submit proof demonstrating that the creation of an alternative would come with an unreasonable cost, this court has denied the claimant's request for relief. *See, e.g., Holt v. Cantrell*, No. E2016-01929-COA-R3-CV, 2017 WL 1535106, at *9 (Tenn. Ct. App. Apr. 27, 2017) (concluding that the plaintiff had presented "insufficient evidence to establish that [he] lacked any reasonable alternative, such as having a road built, to an easement in order to access the more remote parts of his property"); *Lay v. Wallace*, No. W2011-02285-COA-R3-CV, 2013 WL 654360, at *13 (Tenn. Ct. App. Feb. 21, 2013) (agreeing with the trial court's decision to fault the plaintiff for providing "no testimony as to the cost, although there was testimony by the Plaintiff's witness that it was cost prohibitive").

Here, Mr. Shoffner did not submit testimony from an expert witness describing the feasibility and cost of installing an alternative method of access, and the trial court sustained Mr. Urevbu's objection to Mr. Shoffner's attempt to submit what the trial court considered expert testimony about the cost of installing a new staircase. The critical line of questioning that provides the only real information about how much it might cost to install a second staircase connecting the first-floor commercial space to the condominium was entirely contained within Mr. Shoffner's offer of proof. Offers of proof allow a party to inform the trial court of the nature of the evidence that the party is intending to present and create a record of that information for appeal "so that an appellate court can review the trial court's decision" to sustain an evidentiary objection. *Taylor v. State*, 443 S.W.3d 80, (Tenn. 2014) (quoting *State v. Torres*, 82 S.W.3d 236, 251 (Tenn. 2002)); *see also* Tenn. R. Evid. 103(a); *Thomas v. Smith*, 682 S.W.3d 213, (Tenn. Ct. App. 2023) (emphasizing that "[r]eviewing courts cannot" assess whether evidence was properly excluded "without knowing what the excluded evidence would have been").

Critically for his position on appeal, Mr. Shoffner has not, however, actually appealed the trial court's decision to sustain Mr. Urevbu's objection and exclude Mr. Shoffner's testimony on the cost of installing an alternative staircase. *See State v. Lowe*, 552 S.W.3d 842, 864 (Tenn. 2018) (explaining that an offer of proof's "purpose . . . is to preserve *excluded* evidence in a manner sufficient to allow appellate review *of the trial court's decision to exclude the evidence*" (emphasis added)); *Alley v. State*, 882 S.W.2d 810, 815-16 (Tenn. Crim. App. 1994) (emphasizing that offers of proof are intended "to enable consideration *of the issue* on appeal" (emphasis added)). We are not tasked here with assessing whether this evidence was properly or improperly excluded, as Mr. Shoffner has not appealed that issue to this court. *See, e.g., State v. Bristol*, 654 S.W.3d 917, 924 (Tenn. 2022) ("In our adversarial system, the judicial role is not 'to research or construct a litigant's case or arguments for him or her,' but rather to serve as 'arbiters of legal questions *presented and argued* by the parties before them.'" (first quoting *Sneed v. Bd. of Pro. Resp. of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010), then quoting *Carducci v. Regan*, 714 F.2d

171, 177 (D.C. Cir. 1983)) (emphasis added)).

Because Mr. Shoffner did not appeal the trial court's adverse evidentiary ruling and Mr. Shoffner has relied upon testimony contained within his offer of proof, this court is left in the position of assessing his argument about the reasonableness of an alternative with essentially "no testimony as to the cost" except Mr. Shoffner's representations on appeal that installing the second staircase would be "cost prohibitive." *See Lay*, 2013 WL 654360, at *13. As this court has previously held, failure to provide such evidence renders an easement claimant's case deficient in showing a potential alternative is unreasonable. *See id.*; *Holt*, 2017 WL 1535106, at *9. Accordingly, we cannot find reversible error with the trial court's conclusion that Mr. Shoffner failed to show that he lacked a "reasonable alternative" to using Mr. Urevbu's staircase.[4]

V.

Next, we consider Mr. Shoffner's argument that the trial court erred in concluding that he is not entitled to a prescriptive easement. The underlying principles that give rise to an easement by prescription are different from the principles that give rise to any type of implied easement. Implied easements arise from the general notion that purchasers of property intend, even if not explicitly stated, to obtain full use and enjoyment of their land, including the ability to access the land. *See, e.g., Cellco P'Ship*, 172 S.W.3d at 589. Prescriptive easements, by contrast, owe their origin to the doctrine of adverse possession. *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 378 (Tenn. 2007) ("A doctrine related to adverse possession is that of prescriptive easement."); *see also Mathes v. 99 Hermitage, LLC*, 696 S.W.3d 542, 546 (Tenn. 2024) (quoting from a law review article that called prescription an "analogy" to common-law adverse possession).

Although these two concepts are often described as "blended" together, a prescriptive easement differs from adverse possession in that "this easement arises when a use, as distinguished from possession," meets the relevant requirements. *Cumulus Broad., Inc.*, 226 S.W.3d at 378 (collecting authorities). "Adverse possession," or, here, adverse usage that would give rise to a prescriptive easement, "is, of course, a question of fact." *Id.* at 377 (citing *Wilson v. Price*, 195 S.W.3d 661, 666 (Tenn. Ct. App. 2005)). Moreover, Mr. Shoffner, as the prescriptive easement claimant, bears the burden of establishing the existence of such an easement by "clear and convincing" evidence. *Id.* (citing *O'Brien v. Waggoner*, 96 S.W.2d 170, 176 (Tenn. Ct. App. 1936)); *McCammon v. Meredith*, 830 S.W.2d 577, 580 (Tenn. Ct. App. 1991).

---

[4] Mr. Shoffner in a conclusory manner characterizes his property as landlocked. Landlocked has been defined as "[s]urrounded by land, with no way to get in or out except by crossing the land of another." *Landlocked*, Black's Law Dictionary (12th ed. 2024). Mr. Shoffner's property, however, is accessible. The first floor of the parcel has a separate entry way allowing access. Mr. Shoffner has offered no authority to support the proposition that circumstances such as those in the present case create a property that is landlocked. It is not the role of this court to develop such an argument for him.

The Tennessee Supreme Court has previously explained that

> [i]n order to establish [a] prescriptive easement under the common law of this state, the usage must be adverse, under claim of right, continuous, uninterrupted, open, visible, exclusive, and with the knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period. The requisite period of time of continuous use and enjoyment for a prescriptive easement is twenty years.

*Cumulus Broad.*, 226 S.W.3d at 379 (collecting cases) (citations omitted).

The trial court concluded that Mr. Shoffner "did not introduce proof of a continuous and uninterrupted use of the back stairwell . . . [or] any proof that his use or any prior use was adverse."

Many of the requirements for establishing a prescriptive easement are terms of art that have specialized meanings that stem from the adverse possession context. For example, "to be adverse, the use must be under a claim of right inconsistent with or contrary to the interest of the owner and of such a character that it is difficult or impossible to account for it except on the presumption of a grant; or use under a claim of right known to the owner of a servient tenement; or use whenever desired without license, or permission asked, or objection made such as the owner of an easement would make of it, disregarding entirely the claims of the owner of the land." *House v. Close*, 346 S.W.2d 445, 448 (Tenn. Ct. App. 1961) (citing 28 C.J.S. Easements § 14); *Cobbins v. Feeney*, No. M2022-01357-COA-R3-CV, 2023 WL 8661552, at *9 (Tenn. Ct. App. Dec. 15, 2023), *perm. app. denied* (Tenn. May 17, 2024).

Mr. Shoffner does not contend that he individually made use of the staircase in a continuous, uninterrupted, and adverse fashion for twenty years. *See Cumulus Broad.*, 226 S.W.3d at 379. Even assuming for the sake of argument that Mr. Shoffner used the staircase in such a manner since purchasing 414 South Main Street, that would only account for a small fraction of the relevant twenty-year prescriptive period. *See id.*

Mr. Shoffner notes, however, that Tennessee courts allow for a current easement claimant to rely upon the time that a previous owner made use of the same desired easement, which is known as "tacking" in the adverse possession context. *See id.* at 377 ("Successive possessions, or tacking, may be utilized to establish the requisite period of years if there is no hiatus."); *see, e.g., Thompson v. Hulse*, No. E1999-02474-COA-R3-CV, 2000 WL 124787, at *3 (Tenn. Ct. App. Jan. 26, 2000) ("Tacking requires that the combined periods be successive, that each possession must meet the elements of prescriptive easement, and that the possessions be in privity.").

- 21 -

However, Mr. Shoffner's line of argument cannot stand upon the proof presented. Mr. Shoffner presented virtually no evidence of how Mr. Ivery and Ms. Muhammad made use of the staircase while they were owners of 414 South Main Street. While Mr. Shoffner states in his brief that Mr. Urevbu "acknowledged that he and [Ms.] Muhammad used the stairs for eighteen years of [the required prescriptive] time," that supposed concession stems from the Urevbu-Muhammad litigation pleadings. Mr. Shoffner neglected to submit this document as substantive evidence at the bench trial. He did not question any witnesses about the document during the bench trial. He did not ask the trial court in context of the bench trial to take judicial notice of the document, nor did the trial court take judicial notice of these pleadings. In addressing the easement issue at trial, Mr. Shoffner did not call Mr. Urevbu, Mr. Ivery, or Ms. Muhammad as a witness to speak about the use of the staircase during the necessary tacking period. Mr. Shoffner did not call other witnesses who were familiar with Mr. Ivery or Ms. Muhammad's use of the property. Under such circumstances, we cannot fault the trial court for declining to credit Mr. Shoffner's assertion of Mr. Ivery and/or Ms. Muhammad's continuous and uninterrupted use of the staircase.

Even assuming for purposes of argument that the trial court should have considered the pleading from the Urevbu-Muhammad litigation, consideration of the pleadings from that case would damage Mr. Shoffner's prescriptive easement claim. In the same pleading on which Mr. Shoffner seeks to rely, Mr. Urevbu indicates that Ms. Muhammad's usage during the critical of time was with his "permission to use." Mr. Shoffner offered no evidence to the contrary. As noted above, for a use to be considered "adverse" it must be undertaken "without license, or permission asked, or objection made such as the owner of an easement would make of it, disregarding entirely the claims of the owner of the land." *House*, 346 S.W.2d at 448; *see also*, *e.g.*, *Pierce v. Delashmitt*, No. E2011-02748-COA-R3-CV, 2012 WL 5839949, at *8 (Tenn. Ct. App. Nov. 19, 2012) ("Permissive uses of property are not adverse to the owner and, therefore, cannot constitute adverse possession."). Accordingly, even assuming Mr. Shoffner could show that the trial court erred with regard to the other elements and the trial court should have considered the pleadings from the Urevbu-Muhammad litigation, Mr. Shoffner's attempt to rely on Ms. Muhammad's use during the proposed tacking period for the purpose of establishing adversity remains unpersuasive in establishing a prescriptive easement.

Mr. Shoffner had the burden of demonstrating, by clear and convincing evidence, each element of his prescriptive easement claim and that each element existed for a twenty-year period. *See Cumulus Broad.*, 226 S.W.3d at 377; *McCammon*, 830 S.W.2d at 580. Simply stated, the trial court did not commit reversible error in concluding that Mr. Shoffner's proof fell short of that heightened burden. Accordingly, we affirm the trial court's decision respecting Mr. Shoffner's prescriptive easement theory.

VI.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court and remand this cause for further proceedings consistent with this opinion.  The costs of the appeal are taxed to the appellant, Charles W. Shoffner, for which execution may issue if necessary.


s/ Jeffrey Usman
JEFFREY USMAN, JUDGE